LARRY G. SMITH, Judge,
concurring and dissenting, with opinion.
I concur in the affirmance of the judgment for compensatory damages, costs and attorney’s fees. However, I respectfully dissent as to the reversal of the punitive damage award.
The sale of a residence represents, for perhaps the vast majority of citizens, the largest single financial transaction (here, $86,200.00) undertaken during an entire lifetime. Negotiations between buyer and seller leading up to a final agreement often entail a considerable amount of “give and take,” and very often both parties have another transaction hinging upon the closing, such as the purchase of or payment on another residence (in the case of the seller), or the sale of another home (in the case of a buyer). There is a certain amount of stress and strain naturally induced by the circumstances, and at the final stage, the closing, the ordinary seller and purchaser are likely to find themselves wholly dependent upon the good offices and generally unquestioned reliability of financial institutions and title companies, such as appellant.
*208 Here, the seller had no notice of appellant’s inclusion of the extraneous insurance agency claim until the day prior to closing, or at best, only a few days before. Furthermore, on the same date the closing itself was scheduled, the purchase agreement itself expired by its own terms. The trial judge correctly rejected appellant’s contention that appellee’s signing of the closing statement validated any improper items included by appellant, since it is obvious from the facts that appellee’s assent was obtained through duress and coercion after protest by both appellant and her husband.
There was ample evidence from which the trial judge could have concluded that the actions of the title company were not, as the specially concurring opinion suggests, simply those of the ordinary settlement agent carrying out its responsibilities, albeit erroneously, in good faith and with “reasonable cause or excuse.”
The branch manager who closed the loan testified that her only information concerning the Thomas Insurance Agency bill came via a telephone call from Mr. Thomas. No bill was ever sent. No verification was ever sought nor received. No effort was made, so far as the record discloses, to determine the authority of the title company to divert part of the proceeds of sale to a third party creditor, nor to determine whether any legal basis existed for treating the insurance premium charge as a potential lien against the property. Although the branch manager testified as to “our understanding” that the claim could become a lien on the property, it is reasonably in-ferrable from the evidence that the source of this understanding came from her supervisor, whom she had contacted immediately upon receiving the telephone request for collection from the Thomas Agency.[1]
There was no showing of any custom or practice by the title company of collecting unpaid homeowner’s insurance premiums. There was testimony of a general practice of insisting on payment of “something that can be a pending lien,” but the specific examples given by the title company’s only witness were bills for repairs or improvements to the property, and dues owed to homeowner’s associations.
The branch manager further testified that certain other items were commonly included in closing statements, although not designated as claims or liens. She gave as examples abstract and survey costs, and pest inspection fees. These items we know from experience, and we presume the trial judge also knows, are commonly provided for in sales contracts, and can thus fall within the responsibilities of the closing agent. There was a conspicuous absence of any evidence of a custom or practice of collecting homeowner’s insurance premiums where the parties have not mentioned such premiums in their contract as an item to be prorated or assumed by the buyer.
As for the assumption that the title company’s “take it or leave it” approach at the closing can be justified on the basis of a good faith though erroneous belief that the insurance premiums “could become a lien,” the evidence, taken in the light most favorable to Mrs. Dean, paints a somewhat different picture. The branch manager offered no basis for her belief that a possible lien was involved other than the directive from her supervisor: “Pay it. It can become a lien on the property.” It is a matter of no small significance that the supervisor did not testify in this case, and that his failure to testify is not explained. Thus, his self-serving statement, produced by way of hearsay, was not subject to cross-examination as to the basis, if in fact any basis *209 existed, for the belief that homeowner’s insurance premiums “can become a lien on the property.” The branch manager knew that the title report contained no mention of a lien or possible lien concerning this item. No effort was made at the trial to substantiate the “possible lien” theory, and counsel for appellant on this appeal have cited no authority and made no argument to support the premise that the title company reasonably believed its duties as closing agent required or permitted it to collect a disputed debt due for homeowner’s insurance premiums. Even though it became apparent early on that this claim was vigorously controverted, even to the point of a threatened lawsuit, so far as the record shows no effort was made by the title company to confirm its authority to act as collection agent for the insurance agency.
The conclusion that the title company simply made a good faith error in judgment, based upon a reasoned consideration of its duties and responsibilities, is one that can be reached only by adding a degree of color and amplification to the facts that the record before the trial judge does not, in my opinion, justify, let alone require. On the other hand, it was well within the province of the trial judge, in my opinion, to conclude that the title company took advantage of the exigencies of the closing and its dominant position as escrow agent as leverage for the purpose of favoring a third party, a stranger to the transaction, in total disregard of the rights and interests of Mrs. Dean. That the latter conclusion is consistent with the evidence, whereas the former is not, is well illustrated by the actions of the title company during the thirty-day period following the closing. As indicated by the majority, the title company’s check payable to the insurance agency was given to Mr. Dean at the closing. However, one month later, without any advance notice to Mr. Dean, payment on that check was stopped and a new check was issued and sent directly to the insurance agency. Was this action by the title company prompted by any further investigation of the disputed claim, or did the title company stop payment and reissue its check diverting a portion of the sales proceeds based upon any investigation of its legal rights concerning its duties as escrow agent? The answer to both questions is in the negative. In fact, as the title company’s letter of June 14, 1979 to Mr. Dean unmistakably discloses, payment on the check being held by Mr. Dean was stopped, and a new check was forwarded to the insurance agency, simply because the title company was requested to do so by Mr. Thomas.
It seems to me that any analysis relying on “good faith,” or “reasonable cause or excuse,” on the part of the title company would have to reckon with the thirty-day period following the closing during which time the title company retained control of the funds and could easily have determined the propriety or impropriety of its actions. It seems clear to me that the title company could and should have avoided the “now you have it — now you don’t” charade that occurred after the closing.[2]
In my opinion the conduct complained of was sufficiently “gross and outrageous,” Steiner and Munach v. Williams, 334 So.2d 39, 42 (Fla. 3rd DCA 1976), to leave the matter of punitive damages to the sound discretion of the trial judge sitting as the trier of fact. The majority does not explicate sufficient reasons for overturning the punitive damage award, and the reversal violates the rule that if there is “any evidence tending to show that punitive damages could be properly inflicted,” the question should be left to the trier of fact. *210 Jonat Properties, Inc. v. Gateman, 226 So.2d 703, 705 (Fla. 3rd DCA 1969).

. The testimony by the branch manager, on this point, is as follows:
Q. Are you aware in your capacity as a closing agent of any statute or law that gives an insurance company or an insurance agent a lien on property for insurance premiums? A. I am not an attorney.
Q. Did you attempt to ask anybody if that was, in fact, a law?
A. I asked my supervisor whether we were to pay it or not to pay it. Our understanding was since it was homeowner’s insurance that it could become a lien on the property.
Q. What was your understanding or your supervisor’s understanding?
A. My supervisor’s directive was: “Pay it. It can become a lien on the property.”

. The trial judge expressed his views on this point in summing up the evidence at the conclusion of the testimony:
“I think that the corporation defendant had as much knowledge about a possible or probable setoff involving the bill as she had knowledge that the bill was legitimate. All she had was word of mouth on both sides. One man says he owes the money, one man says he owes me more. It’s the subject of a setoff.
“I think that was harassment and bad then. And to compound it, I believe they acted in bad faith when they in 30 days summarily canceled the original check and reissued a draft directly to the creditor.”